May it please the courts, Your Honor, Geoffrey Abraham appearing on behalf of Jekyll of Hewlett-Packard and Steinberg, and also on behalf of Jekyll of Hewlett-Packard. Of course, Patricia, I'd like to reserve the possible five minutes for rebuttal. I'm trying to keep my eye on the clock. Thank you very much. This is set in H.P. appeal you're hearing today, so you've seen some sort of familiarity with the facts. But this appeal involves the district court's approval of the settlement of the shareholding perjurative action brought on behalf of H.P. in a manner which my client believes operates against the very concept upon which the shareholding perjurative action is premised in equity designed to achieve a benefit for the companies when the directors fail to take action. The facts in this case, from my client's perspective, represent a particularly strong case against particularly defendants, Hoffinger and Robeson, who were respectively the CEO and Chief Technology Officer of H.P., who were the sponsors, according to the board resolution located into this, of the acquisition of a time made and in that capacity were responsible for ensuring that all due diligence had been properly performed prior to completing the acquisition. An important piece of due diligence they were unable to get were the Deloitte board papers, which according to Ernst & Young, which H.P. had retained in order to assist in financial due diligence, was a must-have. That was the most critical portion of financial due diligence that had not been completed, and there were other major portions of due diligence that had not been completed. And this, despite the fact that there were many red flags in the public domain that there were issues, major issues with Autonomy's publicly reported financial results. Barclays, H.P.'s investment banker, warned about it. Certain securities analysts flagged it, and most importantly, ironically, a year before this acquisition took place in something called Project A, H.P. himself flagged these issues. And the facts presented also make for a strong case against the directors who knew about these red flags and still allowed a profiteer in Robeson to proceed with the acquisition. The council did not understand our review, our obligation to the year correctly. We do not get to look at the actual conduct of the officers and the directors to decide whether they are liable. It seems like, and tell me if I'm wrong, it seems like the court has to look at the DRC's decision about this conduct, about the officers and the directors' conduct and determine whether DRC's decision was reasonable. That is correct. We never got our chance to battle that. We never had an opportunity to brief it. And there are a lot of reasons set forth in our brief why we think the DRC's report was not, he would succeed on a reasonable doubt standard, we believe, which is essentially a plausibility standard of establishing that it wasn't reasonable or good faith, and also that it was flagged with independence. And we've identified those in the brief. For example, one of the key counsels investigating the matter of Prostower has a relationship with one of the investment bankers. They recuse themselves from considering the information with respect to the investment banker, but the conclusion of the investment banker is that there's no liability because they could have been haters to the bettors because there was no primary liability. So there's a problem with this independence. There's a problem with the independence of the actual Demand Review Committee. And there are a whole host of problems in how the Demand Review Committee reviewed the information. It seems like it was a rather extensive, year-long investigation, and they issued a 140-page recommendation in summary of its findings. So I guess are you challenging the independence and not the extent of the investigation? Your Honor, I'm not challenging the extent of the investigation. However, I believe the plaintiff, I should say the objector, that there were many problems with that analysis. Somebody can take a year, and somebody could still not act in good faith and reasonably. That's like saying if I present you with this new stack of information, I must have obviously done my job. There are occasions where because of whatever prejudices that go into the process, people do not act in good faith. I'm not doubting just because it was a lengthy lot of paper that it was, but I'm just looking at the extent of the investigation and then the standard here to establish a liability, because it seems like it provides evidence to satisfy the gross negligence. Is that right? Or is that a different standard? Well, yes, Your Honor. I mean, it just seems like – I will say that I think initially that that's something that Judge Breyer perhaps had ruled upon, and he didn't. I think our objection is non-frivolous. One thing, for example, the resolution doesn't take into account is the warnings by Barclay with the red flags. It doesn't take into account Project Aggie has been a red flag. It says there were some insecurities in those reports. It drags you from a prior period. It's a dear effort, at least in my mind, and I don't want to accumulate the integrity of other lawyers, but it's a dear effort to claim that whitewashing took place here. This was not a shock to anybody who's following autonomy as a investment. There were clearly known issues about how we recognize revenue. The market drove down HP stock by 20% as soon as they announced the acquisition, and there are many factors identified in our brief, which I believe demonstrate why I agree with reason and some good faith, but more critically on a procedural point. There are two key procedural points here. One is that I believe that Judge Breyer should have responded individually to each of our non-frivolous objections. I believe that's a requirement in this court. And the second thing, and perhaps this should come first, is that there's evidence of collusion, as difficult it is for me to say that, and how the settlement was negotiated. If you look at the original. Well, he did not apply a clear and convincing evidence standard. I believe he applied a presumption that the settlement was negotiated at arm's length, that the presumption of the settlement was a good settlement. I don't see anywhere, if you look at the record of the hearing, that Judge Breyer indicated he was applying a clear and convincing standard. I believe what Judge Breyer said is that each time I asked defendants, how do you schedule a youth settlement, who got off track? And I said, let's schedule a motion to dismiss. The defendants jumped up and said this was a weak case. And that was for the demand futility claim. And that was about all that Judge Breyer found. And I know he's an excellent judge with a well-deserved reputation for excellence. But I think in this case, he made a mistake in that he should have looked at how the settlement was negotiated with these outsized attorney's fees, which don't make sense if you believe the case is a weak case, of $18 million to $48 million, combined with the retention of plaintiff's counsel to dedicate a case in England where they weren't even admitted. Now, it's true that Judge Breyer struck that out of the settlement. The settlement had to be redone. I mean, the settlement had to be interchanging in response to all these objectives. But in a sense, I think that Bluton's stance was a concept that if settlement is conceived in sin, and I'm sorry to use that term, I just don't know a better term, it's still collusive. If I strike out one of the terms that gave rise to the collusion, how does that help you? What do we expect? We expect attorneys to walk into court and say, well, you know, now I'm not getting my $18 million to $48 million. Now I'm done with the settlement. You know, they're basically forced to go forward at the risk of looking silly, quite frankly. But I think that the very fact that somebody would negotiate a settlement of $18 million to $48 million when most are at $3 million in a subsequent arbitration where ATP tells Judge Walker, who's acting as an arbitrator, that they think it's worth no more than $1 million, and that they have a term sheet that the settlement provides for the retention of plaintiffs' counsel as a condition of settlement, that there's evidence of collusion here. And by the way, Your Honors, even if you decided it was difficulty in the case, there are other non-frivolous objections here. We have a release that's too broad. We have no evidence of causation of the proposed consideration. Remember, there were M&A reforms at HP and Aken very soon after they discovered this, that they had been swindled through the absence of due diligence or fraud, depending on one's perspective. And they have governance reforms for which it's unclear why the plaintiffs' counsel, to the extent to which they had an involvement. So what's your objection on the reforms, that they wouldn't have prevented things in the first place, or that they're deficient? Your Honor, the objection is that the reforms that would have helped prevent these M&A reforms have nothing to do with the settlement. All that they have to do, and it's a little confusing, are corporate governance revisions. And the corporate governance revisions, according to HP's response to the proprietary, would not have prevented this, what they call fraud in this transaction. So it's not a substantial benefit to the company, and that even assumes that plaintiffs' counsel had a major role in putting them forward because it's unclear to the extent to which they did. And I believe that some of the parties were deliberately vague on that point. Your Honor, I just wanted you to know you have about four minutes. I do see that I have about four minutes. May I reserve, please, Your Honor? Thank you very much. Good morning, Your Honors. My name is Mark Malumke with the Conchette Petri Party Firm. I represent the appellee, Stanley Moore, account. I also will be dividing my time with Mr. Walensky, and I will be especially mindful of Your Honor's comments earlier today with respect to getting up some of my time. What we've heard today is, with all due respect, issues that were considered, presented at length, and resolved by Judge Breyer, as he should have, during not just one or two, but several different iterations of the settlement. And with respect to the agreement that was presented for final approval, both at the preliminary approval stage, he then gave excessive discovery rights to the two objectors, and then again at the final approval stage. And the standard here is abuse of discretion. A derivative settlement can only be set aside if there's a strong showing that approval was a clear abuse of discretion. And as we put in our papers, we think Judge Breyer not only did not abuse his discretion, but went through all the various relevant factors, especially the value of the governance reforms. Well, there are two things I'd like you to focus on. The first was specifically on the collusion, the attorneys' emails, and then the second thing you referenced, and that is whether the reforms were basically illusory. Very good. Thank you, Your Honor. First of all, with respect to collusion, that was perhaps the one issue that got the most attention in the appellate record. This happened at the very first time we presented a settlement. And that initial version of the settlement had a provision, a severable provision that allowed HP if they wanted to retain plaintiffs' counsel going forward and prosecuting claims against or assisting them in prosecuting claims related to the autonomy deal. During the prior hearing, there was some discussion about value-added rescinders and bundlers, for example. A lot of those were U.S.-based. Obviously, I've been working on this case for two-and-a-half years, roughly, and our investigation included a lot of independent reports on our part that we had disclosed to HP during this process. So that agreement to retain us, we thought, was valuable. More importantly, Your Honors, when it was raised during the approval process, such prior focus on it, there was nothing hidden here. It was attached to the settlement agreement. We pointed out to Judge Breyer that it was a severable provision. In other words, the court could consider the settlement without that proposed retainer agreement. And Judge Breyer didn't find that there was evidence of collusion, didn't find there was a conflict. Rather, he found that it was difficult for him to value that retainer agreement as part of the overall settlement. In fact, he said, and it's in the record, not just during this first approval stage, but later in the final approval stage, that HP, on its own, can retain the Robbins-Geller firm and the Kotchak firm if it wants to help prosecute those claims. There's no reason this has to be part of the settlement. But he certainly didn't find that it was evidence of collusion, evidence of anything wrong. I also point out that this entire settlement process was overseen by former Chief Judge Boone Walker, who was our mediator, who submitted a declaration describing the arm's-length process of the mediation. Did he actually say there was no collusion? He actually said that. He also said that the fee issue was not even raised by the parties until all the other reform provisions were decided. So not only is there no evidence that they've provided that there's collusion, but all the evidence is the exact opposite, that we attempted, and I believe successfully did, Your Honor, to keep this at complete arm's-length, that any fee discussion was only after the important governance reforms were discussed and resolved upon. And then we discussed that. And then, of course, the judge considered evidence of collusion. The same arguments that are being raised today, Judge Breyer considered. And he said, you know what, I think this should be excised from the agreement. And then we did that. So from our perspective, it's much ado about nothing because it was resolved by Judge Breyer. And certainly from our perspective, it could not have tainted the negotiations because the negotiations on the reforms had already been completed. Counsel, why is it reasonable that the release covers claims against non-parties like the accountants and the investment banks? Why shouldn't shareholders be able to pursue the claims against Barclays, for example, or the accounting firms that audited autonomy's books? Well, those were claims that we investigated and looked at very closely. As part of the settlements, obviously sometimes the defendants want to push for a release that covers related claims. But that is something we looked very closely at. It's possible that we could have negotiated a settlement to carve out certain defendants, in fact, or certain third parties. But the point is, we looked at those claims, and we concurred based upon our own investigation that the strongest claims here were against autonomy and its advisors and its officers and directors. So we made a judgment, we believe a sound judgment, that the settlement is very reasonable because it covered release claims relating to HP's side of the equation. Well, sure. Can you point to something more recent or from the 9th Circuit that suggests it's permissible to release claims against non-defendants who are cited cases who are pretty old and non-binding? Masterson, Bergman, 1953, Glicken v. Bradford, New York, 1964. Just look for something that could guide the search. Well, usually I don't have anything from this circuit or closer on point. Those were the best cases that we were able to find, Your Honor. I would say that it is relatively common in my experience in both class action and derivative litigation that sometimes a release is due to cover non-parties because the company who you're suing on behalf of, if you don't release those, first of all, they're doing their own analysis. And, you know, DRC did an analysis of those claims and came to its own conclusions, which informed some of our settlement. I certainly understand that HP wanted it that way. It's easier to, you know, reach a resolution that doesn't have more litigation attached to it. But I'm not certain of that. I'm guided by strong recent and relevant precedent. And the other was the value of the settlement. And I want to get back to questions about the reform practices, regardless of the settlement. Wouldn't HP have done that anyway because of negative publicity about this entire acquisition? Would it have forced it to? They may have, but the evidence is that they didn't. We have different points of view on whether they would have or wouldn't have. All I know is from a plaintiff's attorney bringing a derivative case, you hear that argument all the time. And it was very important to us that when we were negotiating these terms, that they were valuable, that we were adding value to that process. And HP or any kind of trader could say they would have done all this anyway. And, in fact, in this case, there's evidence that they were starting to reform their M&A practices. But the reforms here were not done anyway. They were done as a result of the derivative litigation and our negotiation of the M&A processes. We retained a budget. Judge Breyer made a reference, noted that HP would have implemented the reforms, regardless of this lawsuit. Well, he did not say that they would have implemented the reforms as part of this settlement anyway. What he says is they had already started the process, as one would expect a large company to look at problems. Does that really minimize the value of the settlement? Well, what he said was that they were informed by the litigation, right? They were informed by the litigation, obviously, from our perspective, having sat at a table for months and months and months and proposing these very reforms to them. During the negotiating process, from our perspective, we were the ones who brought the reforms, the company, and the two reforms to the charter, for example, of the Risk Management Committee. The requirement that when you hire an outside accounting, such as KPMG, to do a report, that that report has to be presented to the board so that they can consider it. And that's a very important provision that HP hadn't done in its own right. We'll be here for you. Thank you. Thank you. You have HP seven minutes. Thank you. I'm Mark Walensky again. Let me start where we left off. The reform, there's actually a very extensive record on reforms and how they got developed. Judge Walker, in his opinion, in his CR 381, details how the reforms were developed. But more significantly, if you look at Anne Aschke's declaration, the Steinberg record at age 16, she goes through a chapter and verse of how reforms were started, obviously, after the deal was announced by Meg Whitman. But then there was a continuing process that involved plaintiffs and their counsel in the development of the reforms. That's further developed in a refute armist affidavit that's before you, a refute arm of the head MNA lawyer who also discusses the fact that the reforms, obviously, HP was not going to sit on its hands and let what happened. The plaintiff, the tenancy of the lawsuit and the involvement with the counsel contributed to the development of the reforms. And they were actually negotiated at the final mediation with Judge Walker's involvement. And how much money was lost in this acquisition? And how can we say that the settlement without any monetary relief is fair or reasonable? I think it's ultimately, first of all, let's remember we're recouping the settlement. But going back to that, you have to go back to the work of the Grand Review Committee and the legal standards that govern a suit against the directors and officers here. The DRC concluded that there were no viable claims. That conclusion is entitled to the presumption of business judgment because the plaintiff conceded that the DRC was independent when it made its demand. The question in reviewing the DRC's work is whether the DRC proceeded in good faith and whether it was diligent. And good faith multiply turns on whether the DRC was independent. Two out of the three members of the DRC were not even on the board at the time this law was done. So they had no rock in this fight. Under Delaware law, H.P.'s Charter and Expocation Prohibition, 102B7, provided that the directors could not be sued for breach of the duty of care. They could only be sued for breach of the duty of loyalty. So fundamentally, if there was inadequate due diligence, and obviously a huge issue, a huge defense put up on an astronaut, the directors could not be sued for breach of the duty of care under H.P.'s Charter. And that was a major constraint that the plaintiffs acknowledged in bringing their suit. The claims that my colleague, good friend, Mr. Abraham, pointed to were not the claims against the directors, but the claims against Mr. Robeson and Ms. Rappaphecker, who are not governed by that charter provision. But the claims as to them, under Delaware law, are also subject to a very stringent standard. You would have to show that they were, this is In re Walt Disney, 907A, section 693. They would have to prove that Mr. Rappaphecker, or Mr. Robeson, acted with reckless indifference, or that their actions were without the bounds of reason. Exceedingly difficult standard. And here, if you look at the record that's in the DRC Act, there was due diligence conducted. KPMG did speak to Deloitte. The problem wasn't that the due diligence wasn't conducted. The problem was that the people on the other side of the table were lying. And you can't hold the victims of the fraud liable for the fraud in those circumstances. So that's why I think ultimately they were not viable claims. Speakers. Clearly it was good consideration in the form of the government's reforms. I have a question. I just have another question about government reforms. I mean, that's really the only main thing that was given. And I'm just wondering, should a regression analysis be conducted to determine the value of these reforms? Yeah. I'm with the case law in the circuit. I don't think that that's required. There is some second circuit precedent to that effect in the class action settlement context. But I believe that's a case not at my fingertips where this Court has rejected that second circuit standard. And for good reason. Evaluating reforms is difficult to do, and Judge Breyer actually acknowledged that it's difficult to do. But this means they weren't valuable to the company, and clearly they were. Mr. Bennet, who was an outside director, testified to those. He testified that those reforms were valuable. And, in fact, the reforms are valuable. As a result of those reforms, the Board is much more involved in due diligence and scoping due diligence than it was before. In terms of the support for what kind of consideration is needed, I agree with you that that second circuit, of course, is gone. We actually specifically rejected the second circuit evaluation approach here in the Ninth Circuit. But do you have any cases that you think best support what the Court should look at if they have any other consideration, where it's somewhat of an argument over whether these reforms actually, the nature of them would have prevented anything, or did they go far enough? How do they benchmark that? I think you basically have to use judgment. I don't think there's any specific benchmark. I mean, you look at the reforms. You look at the record behind the support of the reforms. You look at the reforms themselves, and you see they're very detailed. They provide very significant answers to the due diligence process that the company would undertake, the steps that have to be undertaken before you engage in the transactions of this. And, ultimately, it's a question of business judgment or judicial judgment. If you look at it as a question of business judgment, the business judgment by the people who actually adopted these reforms on board is that these were very valuable. And I frankly question whether a Court really is well-suited to question the business judgment of the people who adopted and decided to adopt these reforms. How do they support the release? I can't point to a Ninth Circuit case, but it is routine in derivative cases for releases to be broad. And, remember, there was one misstatement. I think, Your Honor, autonomy's directors and officers, autonomy's accountants, autonomy's investment banker were not released. So no one on that side of the deal got released. People who were released were the directors and officers, HP's advisors, and probably so because there was a conclusion by the DRC that the advisors had no liability. Their conduct was contractual. By contract, they were entitled for law and information provided by autonomy. And, much more fundamentally, there's no indication that HP's advisors had any reason to believe that autonomy was concluded. Thank you. Your Honor, one thing I'd like to direct the Court's attention to is on page 33 of our opening brief with a list of items which are still obscure from review by the plaintiff because they've been cloaked in attorney-applied privilege. And they're key matters which apparently informed the DRC analysis. And this follows our earlier efforts. By the time we filed the complaint, we weren't even given a copy of the DRC resolution and it took additional discovery to get the underlying keys and facing, which is a series of slides. I believe it was. I'm sorry. I'm sorry. I opened by saying I forgot to say in the opening. It was, you asked me a question. It was a wide-ranging question. I apologize. On the issue of release, I'd just like to point out that Apotheker and Robeson were nowhere near the company at this time. They were clearly former officers. It was long gone by the time the release was given. And there is nothing on the issue of causation that demonstrates that this case had anything to do with reforms taken. There is statement, and I immediately started reforming it. There's complete vagueness in the record as to when these M&A reforms took place, though they appear to have taken place before the settlement of this case, and this vagueness with respect to the governance revisions. This is just, like, almost entirely made up of thin air. If you take these, you'll take anything. You can make things up. Now, on the issue of officers being liable, 102B7, as Ms. Dolan, as he correctly knows, does not protect Apotheker and Robeson. But there's a key fact here, and that is Ernst & Young was doing due diligence. Apotheker and Robeson were responsible for seeing to it that all due diligence had been properly completed. They never even bothered to read the Ernst & Young report. They had no idea, as Mr. Cutchin said in the district court, they were stumped when they interviewed Mr. Apotheker. He had known that they had not obtained the Floyd & Tewsport papers, and the complaint that they ultimately filed against both time and former officers was based almost entirely on those Floyd & Tewsport papers. So what we have here, we have many issues, and the issue really on this appeal is, in a sense, procedural. Judge Breyer never really addressed these non-frivolous objections. He never said, no, this objection you made is wrong for this reason, this objection you made is wrong for that reason. He simply approved the settlement. At the very least, we should have Judge Breyer address each of those objections. Also, I will adhere to my position, as painful as it is for me to say, that there's a collusive element to the settlement. If you look at S.E.P. 538, and it's the term sheet, you'll see .1E. One of the key provisions of the term sheet is the provision of assistance to H.P.'s U.S. counsel in subsection 1.C and 1.D shall be consistent with the terms of the letter engagement to be negotiated by the parties. But what does that do? It gives the plaintiff's counsel an ability to say, we are not satisfied with the terms of retention, and therefore, we're not going through with the rest of this term sheet. It's a conditional precedent, in a sense, for consummation of the settlement, and it gives them extraordinary power to get between $18 and $48 million in attorney's fees for something that H.P. thinks is worth $1 million. And after a lot of giving table settlement agreement, after all that extra work, maybe there's $3 million in loan start. Using common sense, and I don't know if the 930 case directly went to me for this, but in that case, every case using the common law jurisprudence of common sense, who would pay between $18 and $48 million for something that's worth $1 million, we believe, or something where people had to pay less than $3 million in loan start? It just makes no sense, Your Honor. It's insane. And what was H.P. thinking? Oh, let's do it. Something else is going on here. There are problems with the Demand Review Committee report. We've pointed them out in our brief. It's a plausibility standard. We've alleged facts plausibly. The third member of the Demand Review Committee, to which Ms. Lewinsky refers, was trying to recuse himself from consideration of the Perella-Weinberg liability issue. And as I mentioned before, whether Perella-Weinberg is potentially liable on an aiding and abetting theory is inherently intertwined with whether the directors themselves and the officers are potentially liable for breach of the D3 treaty. Up and down throughout the process, there was a lack of independence, and it shows through at the end of the day. With analysis that makes no sense, the red flags weren't there, even though everybody knew, including Project Aggie, from a year before, even though all the securities analysts, or most of them knew, even though Barclays informed the board, there were no red flags. Everybody knew it. But we didn't. I'm sorry, Your Honor. There's nothing to be sorry about. He's just argued Markel versus Hewlett-Packard, and the objectives of Oakland and Steinberg is submitted. But what I'd like to think, all counsel votes in this case, on the previous case, have been very helpful for me in my work. Thank you.
judges: McKeown, Murguia, Rufe